UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| OMAR BOTERO-PARAMO | ) | Case No. 08-17639-SSM |
| | ) | Chapter 11 |
| Debtor | ) | |
| | ) | |
| THE BANK OF NEW YORK MELLON | ) | |
| TRUST CO., N.A. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 09-1233 |
| | ) | |
| OMAR BOTERO-PARAMO, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

In this action to determine the relative priority of two deeds of trust against real property formerly owned by the debtor and his wife, the contending noteholders have each moved for summary judgment. The deed of trust securing defendant Tysons Financial, LLC ("Tysons") was recorded first, but Bank of New York Mellon Trust Co., N.A. ("BONY Mellon") asserts that it was later released. In the alternative, BONY Mellon argues that it should be equitably subrogated to an earlier deed of trust, thereby giving it priority over Tysons. For the reasons stated, the court determines that Tysons's deed of trust is entitled to priority.

1

<u>Background</u>

Omar Botero-Paramo filed a voluntary petition in this court on December 5, 2008, for relief under chapter 11 of the Bankruptcy Code.  His wife, Maritza Urdinola, filed her own chapter 11 petition on August 3, 2009.  Both of them remain in possession of their estates as debtors in possession.  A plan has not yet been confirmed in either case, and the outcome of this litigation will determine, not only which of the competing noteholders is entitled to payment from sales proceeds that were escrowed in connection with a sale approved by this court, but also which of the two has an unsecured claim against the debtors for the purpose of voting on a plan and receiving distributions.

Among the assets listed on each debtors' schedules were four jointly-owned parcels of real estate, only two of which are relevant to the present action.  The first, which lies at the heart of the controversy, is located at 10447 New Ascot Drive, Great Falls, Virginia,[1] and the second, which figures to a lesser extent, is located at 10511 Lawyers Road, Vienna, Virginia.[2]  The

---

[1]  The legal description for 10447 New Ascot Drive—which, to add to the confusion, was originally known as 625 Springvale Road, Vienna, Virginia—is as follows:

Beginning in the center of SPRINGVALE ROAD, Route 674 said point being South 16º 33' 10" West 52.36 feet from the corner of Finger and Douglas W. and Eugene R. Appleton, thence departing from the road and running through the property of Appleton South 56º 10' 20" East passing over a pipe at 15.71 feet, 363.04 feet to a pipe, then South 16º 33' 10" West 199.31 feet to a pipe, thence North 72º 51' West 346.68 feet to the center of Route 674, thence with the center of Route 674, North 16º 33' 10" East 303.51 feet to the beginning.  Containing 2.00 Acres more or less.

[2]  The legal description of 10511 Lawyers Road is as follows:

Lot 4-B of a Resubdivision of Lot 4, GABRIEL VILLENEUVE PROPERTY, as duly dedicated, platted and recorded in Deed Book 5850 at Page 121, among the

(continued...)

2

Lawyers Road property was (and is) the debtors' residence; the New Ascot Drive property was a so-called "spec" house that was being constructed for sale. The debtors acquired the New Ascot Drive property in June 2005, and financed the purchase with a $2.79 million loan from First Savings Mortgage Company ("First Savings") which was secured by a first deed of trust against the property that was due on July 1, 2007. In September 2005, they borrowed $400,000 from Congressional Funding USA, LLC, secured by a third deed of trust against their residence (the Lawyers Road property). In December 2005, they refinanced that loan. The new loan was for $500,000, with a maturity of January 1, 2007. As additional security, Congressional Funding required a lien against the New Ascot Drive property also. For reasons that are unclear, the deed of trust that was prepared and recorded lists only the New Ascot Drive property—which is referenced both by street address and by legal description on an attached "Exhibit A"—within the instrument proper. An attached "Balloon Rider" likewise refers by street address only to the New Ascot Drive property but has its own "Exhibit A" which contains a legal description for the Lawyers Road property. There is no dispute, however, that the intention was to grant a lien against both properties.

As originally recorded on December 29, 2005, the space provided on the printed form deed of trust for the name of the trustee was left vacant, and the name and address of the intended trustee, Kevin J. Kelley, was instead inserted in the blanks provided for the lender.[3] At

---

[2](...continued)
land records of Fairfax County, Virginia.

[3]  A close examination of the deed of trust reveals that Congressional Funding's name and address were originally typed in as the lender but were then struck out and Mr. Kelley's name and address were inserted. Whether this occurred before or after the debtors signed the

(continued...)

some point after the deed of trust was recorded, the error was discovered, and a title company

employee inserted Mr. Kelley's name in the blank for the trustee, struck out Mr. Kelley's name

and address in the blank for the lender, and inserted the name and address of Congressional

Funding.  The corrected deed of trust, however, was not re-executed by the debtors or re-

acknowledged.  Instead it was simply re-recorded on July 24, 2006.  In the interim, the note itself

had been sold to Tysons Financial, LLC, on December 27, 2005, with the loan being serviced by

Southern Management Corporation.

In November 2006, the debtors requested that Tysons Financial release its lien against the

Lawyers Road property so that they could refinance it.  Tysons agreed to do so and executed a

"Certificate of Release of Deed of Trust."  The certificate identified both the original and

corrected deed of trust by deed book and page, the face amount secured, and the secured party.

Relevant to the present controversy, it identified the "Property hereby released" as 10511

Lawyers Road, Vienna, Virginia and, under the heading "Affidavit and Release," stated: "I

certify I am the holder of the above-mentioned note secured by the above-mentioned Deed of

Trust.  The Lien thereon created and retained on the above mentioned property is hereby

released."  The certificate was recorded on December 19, 2006.  The debtors continued making

payments on the note until September 2008.

On June 4, 2007, the debtors refinanced the first deed of trust on the New Ascot Drive

property.  The new loan, in the amount of $2.66 million, and with a maturity of 30 years, was

made by American Brokers Conduit, with the proceeds paying off the First Savings loan, on

---

[3](...continued)
deed of trust is not shown by the record, but in any event it was done before the deed of trust was
first recorded.

which approximately $3.1 million was owed.  In addition to the American Brokers Conduit loan,

a $625,000 loan was made by Secured Lending, LLC, secured by what was intended to be a

second deed of trust.  In connection with the title examination for the two loans, it was not

recognized that the certificate of release referenced only the Lawyers Road property, and it was

not reported as a lien against the property.  By mistake, the Secured Lending deed of trust was

recorded prior to the American Brokers Conduit deed of trust but was subsequently

subordinated.  In any event, the American Brokers Conduit note was purchased by Barclay's

Bank for Sutton Funding, LLC ("Sutton"), as part of a pool of mortgages, and was held by

Sutton at the time the debtors' chapter 11 cases were filed.

In the course of the chapter 11 case, both Sutton and Tysons filed motions for relief from

the automatic stay with respect to the New Ascot Drive property.  Sutton's motion, which was

filed on December 12, 2008, was resolved by a consent order entered on February 4, 2009,

conditioning the automatic stay upon the cure of payment defaults.  Tysons's motion was filed

on March 18, 2009, and was resolved by a consent order entered on April 30, 2009, conditioning

the automatic stay upon the cure of existing payment defaults.

In June 2009, the debtor filed a motion to approve a sale of the New Ascot Drive

property free and clear of liens.  Although the motion treated the Tysons deed of trust as a first

lien against the property, it proposed to pay only the principal amount without interest or other

charges.  Tysons objected to the sale, and a "consent order" (endorsed only by counsel for the

debtors and for Tysons) was entered on July 17, 2009, authorizing the sale of the property, with

Tysons to receive at settlement the full amount of its claimed pay-off, and the balance going to

Sutton.  On July 27, 2009, Secured Lending—which was slated to receive nothing from the

5

sale—filed a motion to alter or amend the sales order.  In its motion, Secured Lending asserted

that Tysons should receive nothing from the sale, since, according to the objection, Tysons's

deed of trust had been released.  Finally, on August 7, 2009, Sutton, which up to this point had

remained silent, belatedly stirred itself and filed both a motion to file an objection to the sale out

of time and a motion to vacate, alter, or amend the sale order.  Ten days later, it commenced the

present adversary proceeding to determine the priority of its lien.  After an emergency hearing

and several short continuances, an order was entered on August 17, 2009, vacating the original

sale order.  A new consent order, endorsed by all parties, was signed on August 28, 2009, and

entered on September 2, 2009, allowing the sale of the New Ascot Drive property for $2.78

million free and clear of liens.  After a carve-out for the fees of debtor's counsel and settlement

of an unrelated controversy, the order directed:

> ORDERED, that all remaining proceeds of the sale of the Property in the
> approximate amount of Two Million Five Hundred Six Thousand Six Hundred
> Ninety-Five Dollars ($2,506,695.00) shall be forwarded to Sutton Funding, c/o
> Rathbun & Goldberg, of which amount Seven Hundred Twenty-Two Thousand
> Five Hundred Dollars ($722,500.00) shall be held in mutually agreeable escrow
> account(s) (the "Escrowed Funds") between Sutton and Tysons pending
> resolution of the priority dispute between Sutton and Tysons and further Order of
> this Court; and it is further

> ORDERED, that all parties other than Tysons and Sutton release any claim to the
> sale proceeds other than as set forth in this Order or Escrowed Funds, and this
> order shall not prejudice Sutton or Tysons as to any issue, with regard to lien
> priority or otherwise, and should Tysons by order or consent receive any portion
> of the Escrowed Funds, and if such portion shall be less than the full amount of
> the Escrowed Funds, Sutton shall be entitled to the balance[.]

On September 17, 2009—approximately two weeks after entry of the sale order and one

month after commencement of this adversary proceeding—the note held by Sutton was sold at a

very substantial discount to BONY Mellon, as part of a pool of mortgages, and BONY Mellon,

6

in its capacity as "Grantor Trustee of the Protium Master Grantor Trust" was eventually

substituted for Sutton as plaintiff.  It is undisputed that BONY Mellon has already received, from

the sales proceeds of the New Ascot Drive property, an amount substantially in excess of what it

paid for the note.

<u>Discussion</u>

I.

As originally filed, the complaint named as defendants the debtors, Tysons, Steven A.

Michael, PLLC (the substitute trustee under the Tysons deed of trust), and 12 other parties.

After the final order was entered approving the sale of the New Ascot Drive property free and

clear of liens, the complaint was amended to reduce the universe of defendants to the debtors,

Tysons, Michael, Gary Zell (the trustee under BONY Mellon's own deed of trust), and Mortgage

Electronic Registration Systems, Inc. (the beneficiary, as nominee for the lender, of the BONY

Mellon deed of trust), and to add two additional defendants, Signature Title & Escrow, LLC (the

settlement agent for the American Brokers Conduit loan) and Travelers Casualty and Surety

Company of America (which issued a bond required of real estate settlement agents in Virginia).

The counts against Signature Title and Travelers were dismissed for lack of subject-matter

jurisdiction, leaving only the counts against Tysons and Michael.  Count I seeks a declaration

that BONY Mellon is entitled to the escrowed sales proceeds because Tysons's lien was released

by the certificate of release.  Count II seeks equitable subrogation of BONY Mellon to the First

Savings deed of trust.  Tysons filed a three-count counter-claim.  Count I of the counter-claim

seeks a declaration that Tysons is entitled to the escrowed sales proceeds, while Count III seeks

imposition of a constructive trust.  Count II, which had sought equitable subordination of BONY

Mellon's lien to Tysons's, was dismissed for failure to state a claim for relief.

II.

Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.  Fed.R.Bankr.P. 7056; Fed.R.Civ.P. 56(c).  In the present case, the material facts

are not in conflict, and the issues to be decided are either questions of law or mixed questions of

fact and law.  Stripped to their essentials, the questions are as follows:

- First, did the "certificate of release" release Tysons's lien against the New Ascot Drive property?

- Second, if not, is Bank of New York Mellon nevertheless entitled, under principles of equitable subrogation, to be substituted to the security of the First Savings note?

A.

As a threshold matter, however, BONY Mellon contends that it is not necessary to reach

the issues of release and equitable subrogation framed by its own amended complaint

because—it now asserts—the Tysons deed of trust is insufficient to create *any* lien.  This is so, it

argues, because the original deed of trust failed to name a trustee and misidentified the lender,

and the subsequent corrections were not acknowledged by the debtors prior to the re-recording of

the deed of trust.  The court observes, first, that this theory was never articulated in the original

or amended complaint and was only raised 15 months into the case when BONY Mellon sought

leave to amend its answer to Tysons's counter-claim.  Because discovery was complete and the

issues were otherwise ripe for adjudication, the court denied the motion to amend.

8

But even if the underlying validity of the Tysons deed of trust was—at least by implication—placed in contention by the allegations of the complaint, the court would be unable to conclude that the deed of trust did not give Tysons a lien against the New Ascot Road property.  It is undoubtedly true that material alterations cannot be made to a deed after it has been signed without a new acknowledgment.  *In re Scialdone*, 197 B.R. 225, 227 (Bankr. E.D. Va. 1995).  In *Scialdone*, a deed to the debtor and his wife did not include language creating a tenancy by the entireties.  After the deed was delivered to the debtor, but before it was recorded, the debtor altered it by inserting the words "as tenants by the entirety with right of survivorship as at common law."  *Id.* at 226.  Judge Tice held that, because the grantors did not acknowledge the language inserted by the debtor nor re-execute the deed, the inserted language "had no effect on the type of estate conveyed to the grantees."  *Id.* at 227.  In so holding, *Scialdone* cited, among other authorities, an opinion of the Supreme Court of Appeals of Virginia which had held that an unsigned memorandum, attached to a deed that was complete and duly signed, had no effect.  *Allen v. Parkey*, 154 Va. 739, 149 S.E. 615, 618 (1929).

In the present case, the unsigned and unacknowledged changes that were made to the original deed—inserting the name of the intended trustee and correcting the name of the secured party—do not materially alter the estate being conveyed or the amount or maturity of the obligation secured by it.  But even without the corrections, the deed of trust was by no means a nullity.  First, in Virginia, the mere fact that a deed of trust fails to name a trustee does render the deed of trust invalid, but merely requires resort to a court of equity to enforce it.  *Bank of Christiansburg v. Evans*, 163 Va. 804, 808, 178 S.E. 1, 2 (1935) ("[I]t is well settled that a deed of trust on real estate to secure creditors, in which the name of the trustee is left blank, is an

equitable mortgage, and may be enforced as such upon the principle that equity will treat that as done which, by agreement, is to be done."). Second, the deed of trust, although incorrectly identifying the intended trustee as the lender, otherwise correctly describes the date of the note, the amount secured and the maturity date. It also provides a proper and sufficient legal description of the New Ascot Road property. No case has been cited to the court, and the court's own research has discovered none, in which a Virginia court or a federal court applying Virginia law has held that mere mis-identification of the lender's name invalidates an otherwise proper deed of trust. For that reason, the court concludes that Tysons, as the holder of the note described in the deed of trust, was validly secured by the New Ascot Road property.

B.

That leaves for consideration the question of whether Tysons's lien was extinguished when the Certificate of Release was recorded. Although in Virginia a deed of trust may be released by a deed of release executed by the trustees, such a procedure is rarely if ever resorted to these days, and the ordinary mode of releasing a deed of trust is by recording a certificate of satisfaction. Va. Code Ann. § 55-66.3. Such a certificate must be "signed by the creditor or his duly authorized agent, attorney or attorney-in-fact, or any person to whom the instrument evidencing the indebtedness has been endorsed or assigned for the purpose of effecting such release," and must include or be accompanied by an affidavit "stating that the *debt therein secured and intended to be released or discharged has been paid* to such creditor, his agent, attorney or attorney-in-fact, who was, when the debt was satisfied, entitled and authorized to receive the same." Va. Code Ann. § 55-66.2(B) (emphasis added). When properly filed and recorded, the certificate of satisfaction "shall operate as a release of the encumbrance as to which

10

such payment or satisfaction is entered and, if the encumbrance be by deed of trust, as a

reconveyance of the legal title as fully and effectually as if such certificate of satisfaction were a

formal deed of release duly executed and recorded."  Va. Code Ann. § 55-66.2(C).  Additionally,

when a deed of trust encumbers more than one parcel, the creditor may "record a certificate of

partial satisfaction of any one or more of the separate pieces or parcels of property covered by

such lien."  Va. Code Ann. § 55-66.4.  A certificate of partial satisfaction "may be accomplished

in manner and form hereinbefore in this chapter provided for making . . . certificates of

satisfaction, except that the creditor, or his duly authorized agent, shall make an affidavit to the

clerk or in such certificate that such creditor is at the time of making such release the legal holder

of the obligation, note, bond or other evidence of debt, secured by such lien, and when made in

conformity therewith and as provided herein such partial satisfaction or release shall be as valid

and binding as a proper release deed duly executed for the same purpose."  *Id.*  A certificate of

satisfaction or certificate of partial satisfaction must "conform substantially" with the forms set

forth in the statute.  Va. Code Ann. § 55-66.4:1.  The statutory forms are captioned

"CERTIFICATE OF SATISFACTION" and "CERTIFICATE OF PARTIAL SATISFACTION,"

respectively.  Both forms require identification of the place of record, the date of the deed of

trust, the deed book and page of the deed of trust, the names of the grantors, the names of the

trustees, and the face amount of the notes.  The only significant difference, apart from the

caption, is with respect to the matter certified.  The certificate of satisfaction states:

> I/we, holder(s) of the above-mentioned note(s) secured by the above-mentioned
> deed of trust, do hereby certify that the same has/have been *paid in full, and  the
> lien therein created and retained is hereby released.*

*Id.* (emphasis added).  The certificate of partial satisfaction, by contrast, makes no representation as to payment, but instead speaks only of release and identifies a specific parcel:

> The lien of the above-mentioned deed of trust securing the above-mentioned note is *released insofar as the same is applicable to* .......... *(description of property)* recorded in deed book ... at page ... in the clerk's office of this court.  The undersigned is/are the legal holder(s) of the obligation, note, bond or other evidence of debt secured by said deed of trust.

*Id.* (emphasis added).

There can be no question that the Certificate of Release of Deed of Trust executed by Tysons did not literally follow either of the statutory forms.  First, the title—certificate of *release* —is different from that set forth in the statute.  Second, the description of the parcel being released has been separately set out (while still being referenced as the "above-mentioned property") from the text of the certification.  Nevertheless, the court has little difficulty in concluding that the certificate, even though omitting the word "partial" in its title, did not release the deed of trust in its entirety but only as to the Lawyers Road property.  That is not only what it literally says, but was clearly the intention of Tysons and the debtors.  It is significant that the certificate lacks the language that the secured note "has been paid in full" (which is required of a certificate of satisfaction) and states only that the lien is released "on the above-mentioned property," which is consistent with a certificate of partial satisfaction. This is not to say that the certificate, or, for that matter, the deed of trust, was a model of clarity or reflects any credit on the professionalism of those who drafted them.  The certificate of satisfaction lists only a street address rather than a legal description of the property being released.  The only street address in the deed of trust was the New Ascot Drive property, and a reader of the instrument would have to be very astute to realize that the legal description contained in the second "Exhibit A" (the one

12

attached to the rider) referenced a second parcel, namely, the Lawyers Road property.

Nevertheless, the fact that the deed of trust listed only the New Ascot Drive address, while the

certificate of release specifically referenced a Lawyers Road address—particularly when the

statutory form of certificate of satisfaction contains no reference to a property description, while

a certificate of partial satisfaction does—would naturally lead a careful title examiner to look

further and not rely solely on the absence of the word "partial" from the title of the certificate.

Having considered all the circumstances, the court concludes that the certificate of release did

not release the Tysons deed of trust in its entirety, but only as to the Lawyers Road property,

with the result that it remained as a lien against the New Ascot Drive property.  Because the

Congressional Funding/Tysons deed of trust was recorded a year and a half before the American

Brokers Conduit deed of trust to which BONY Mellon has now succeeded, Tysons's lien is

entitled to priority *unless* BONY Mellon can establish priority under the doctrine of equitable

subrogation—an issue to which the court now turns.

## C.

Subrogation is an equitable remedy which substitutes another person or entity in the

place of the creditor whose claim was satisfied.  *Federal Land Bank of Baltimore v. Joynes*, 179

Va. 394, 401, 18 S.E.2d 917, 920 (1942).  Upon substitution, the other person succeeds to the

rights of the creditor in relation to the debt.  *Id.*  As with any equitable remedy, the court must

consider the facts and circumstances of each particular case.  *Moritz v. Redd*, 151 Va. 644, 652,

145 S.E. 245, 248 (1928).  The comparative equities of the parties must be examined to ensure

that the principles of law and justice are served.  *Gatewood v. Gatewood*, 75 Va. 407, 411 (1881)

13

("[Subrogation] is the act of the law, and the creature of a court of equity, depending not upon

contract, but upon the principles of equity and justice.").

Reported decisions in Virginia support the view that "subrogation is generally allowed

where the loan was made by one who took a security from the borrower which turned out to be

invalid." *Morgan v. Gollehon*, 153 Va. 246, 250, 149 S.E. 485, 486 (1929); *see also Bankers'*

*Loan and Inv. Co. v. Hornish,* 94 Va. 608, 27 S.E. 459 (1897) (where the lender paid off the

notes held by another bank, the new lender was subrogated to the rights of the original

noteholder); *Mayer v. United States (In re Reasonover)*, 236 B.R. 219, 231-233 (Bankr. E.D. Va.

1999) (partially allowing equitable subrogation where new loan paid off prior loan that had not

yet been released of record when the debtor's bankruptcy case was filed), *vacated and remanded*

*on other grounds*, 238 F.3d 414 (4th Cir. 2000) (unpublished table decision), *op. on remand*,

2001 WL 1168181, 2001 Bankr. LEXIS 2109 (Bankr. E.D.Va., Apr 16, 2001).[4]

*Joynes* is illustrative of this point.  In that case, Emma Joynes and her two sons owned

land as tenants in common.  One day Mrs. Joynes conveyed her one-third interest to her sons in

return for an annuity of $700 per year.  As security, she retained a lien on her interest, and her

sons granted a lien on their respective interests in the land.  Subsequently, the sons executed a

deed of trust against the land to secure a debt owed to Virginian Joint Stock Land Bank.  In

conjunction with the transaction, Mrs. Joynes agreed to subordinate her liens.  When payments

---

[4] This principle has been codified by statute for certain refinance deeds of trust, which
will retain their priority over existing subordinate deeds of trust not exceeding $50,000, provided
the principal amount of the new deed of trust does not exceed the prior deed of trust by more
than $5,000 and the interest rate of the new note does not exceed the interest rate on the prior
note.  Va. Code Ann. § 55-58.3.  Since Tysons's deed of trust secures an amount well in excess
of $50,000, the statute has no applicability to this case.

to the bank became delinquent, the sons obtained loans from the Federal Land Bank of Baltimore

and the Federal Farm Mortgage Corporation to pay off Virginian Joint Stock.  These new loans

were secured by a first and second lien on the property, but the parties through inadvertence did

not require Mrs. Joynes to subordinate her liens.  In a suit brought by Mrs. Joynes to establish

the priority of her lien, the Court held that the subsequent lenders were subrogated to the lien of

Virginian Joint Stock.  The Court acknowledged that the subsequent lenders acted negligently

but reasoned that the equities favored them because Mrs. Joynes would not be prejudiced in light

of the previous subordination of her lien and the fact that the new loans were for a lesser amount

than the loan that was paid off.  *Id.* at 407-08, 18 S.E. at 923.[5]

   That equitable subrogation is not a matter of right, however, is well-illustrated by a

subsequent opinion of the Virginia Supreme Court did not allow subrogation.  *Centreville Car

Car, Inc. v. North American Mortg. Co.*, 263 Va. 339, 559 S.E.2d 870 (2002).  In that case, a

prior owner of the property, Ms. Lynch, had purchased it with a loan secured by a first deed of

trust that was ultimately assigned to Fleet Mortgage Company.  Later, Ms. Lynch and her

husband borrowed money from a predecessor of Centreville Car Care, Inc. ("Centreville"),

secured by a second deed of trust against the property.  Three and a half years later, Ms. Lynch

sold the property to a husband and wife named the Bouzghaias, who financed the purchase with

a loan from North American Mortgage Company ("North American").  The title examination

---

[5]  A significant additional circumstance in *Joynes* was that Mrs. Joynes died after the suit was commenced, leaving her sons a life estate in the property.  The sons had each discharged their personal liability to pay the annuity in bankruptcy, and only the land stood as security for its payment.  Absent equitable subrogation, their right to pay themselves the annuity they had failed to pay their mother would be superior to the rights of the lenders, in derogation of the warranty of title contained in the deed of trust they had given.  179 Va. at 405-08, 18 S.E.2d at 921-23.

that was performed in connection with the sale failed to discover the Centreville second deed of

trust.  Fleet, whose loan was paid off by the proceeds of the new loan, then filed a certificate of

satisfaction of its deed of trust.  After the Centreville loan went into default and a foreclosure

sale was noticed, North American, the new lender, brought a suit in equity seeking equitable

subrogation.  The chancellor, relying on *Joynes*, equitably subrogated North American to the

priority position of Fleet to the extent of the amount Fleet was paid.

The Virginia Supreme Court reversed.  It noted, first, that "no bright-line rule for the

resolution of claims for subrogation can be formulated because the merits of such claims are

necessarily fact specific[.]"  *Id.* at 345, 559 S.E.2d at 872.  The opinion then laid out two

"principles or guidelines . . . that assist in the proper analysis of such claims":

> First, subrogation is not appropriate where intervening equities are prejudiced.
> Second, ordinary negligence of the subrogee does not bar the application of
> subrogation where "[a]n examination of the facts . . . shows that the equities
> *strongly favor*" the subrogee. (emphasis added).

*Id.*  (alterations in original; internal citations omitted).  The Court found significant what it

termed the "legal separation between the obligors on the prior loans and their ownership of any

equity in the property."  *Id.* at 346, 559 S.E.2d at 873.  Because they no longer owned the

property, Ms. Lynch and her husband would have no incentive to pay the Centreville loan, which

Centreville would have had every expectation would be paid at such time as the property was

sold.  Additionally, Centreville, being undersecured if North American were granted priority,

would receive little or nothing if North American and the buyers were to orchestrate a "friendly

foreclosure" to wipe out its interest.  *Id.* at 347-48, 559 S.E.2d at 874.  With respect to the

argument that Centreville, which had never bargained for more than a second-lien position,

would receive a "windfall" by having its lien advanced to first position, the Court reasoned:

16

> While it is undoubtedly true that Centreville received a significant benefit as a
> result of the satisfaction of Fleet Mortgage's lien from the funds provided by
> North American . . . in that Centreville's lien advanced to the position of priority
> of a first lien on the property, we would not characterize that benefit as a windfall
> that suggests unjust enrichment under the circumstances of this particular case.
> Moreover, any "windfall" in this case as a result of granting subrogation would
> inure to the benefit of the negligent title examiner and the party that insured the
> title for North American Mortgage and the Bouzghaias.  While North American
> Mortgage and the Bouzghaias have recourse against those parties for the loss in
> this case, Centreville has no such recourse.  Thus, the equities in this case favor
> Centreville, the innocent party who would be prejudiced if subrogation were
> granted.

*Id*. at 348, 559 S.E.2d at 874.

A similar result was reached in a case decided by the United States District Court for this

district applying Virginia law.  *Deutsche Nat'l Bank Trust Co. v. Batmanghelidj*, 2007 WL

2713109, 2007 U.S. Dist. LEXIS 68499 (E.D. Va., September 17, 2007) (Cacheris, J.).  In that

case, Babak Batmanghelidj had borrowed $990,000 secured by a deed of trust against property

originally owned by his wife but transferred to himself and his wife at the time the loan was

made.  The loan proceeds paid off three existing deeds of trust against the property as well as

state property taxes and an automobile loan, with the remaining $185,872 being disbursed to Mr.

Batmanghelidj.  The title examination failed to discover a judgment lien in favor of KFH

Investments, LLC ("KFH") that had been recorded prior in time to either of the two junior deeds

of trust that had been paid off and two federal tax liens which—although the opinion is not

entirely clear on the point—appear to have been recorded before any of the deeds of trust.

Deutsche Bank, the assignee of the deed of trust securing the new loan, brought an action

for equitable subrogation giving its deed of trust priority over the KFH judgment lien and the

two federal tax liens.  On motions by KFH to dismiss the complaint for failure to state a claim

for relief and by the United States for judgment on the pleadings, the Court, after a detailed

17

analysis of Virginia law as set forth in *Joynes* and *Centreville Car Care*, held that the pleaded

facts did not support equitable subrogation.  The Court noted that the payment of the loan

proceeds to the holders of the two junior deeds of trust and to Mr. Batmanghelidj was a windfall

to them that clearly prejudiced KLH and the United States, both of whom should have been paid

first.  *Id.* at *4.  The Court further noted that the equities did not *strongly favor* Deutsche Bank

even to the extent its loan paid off the first deed of trust, and explained:

> [A]ny amount of subrogation would reward Deutsche Bank's failure, or the
> failure of its predecessor in interest, to discover the recorded liens upon execution
> of the Deed in Trust.  That failure may give [Deutsche Bank] a right of recovery
> against its predecessor in interest, the title insurance company, or the
> Batmanghelidjs, but does not give it a right of precedence over the liens it did not
> discover.  Under Virginia law, negligence does not in itself bar subrogation,
> provided there are other strong equitable reasons for awarding it.  However,
> rewarding Deutsche Bank for the mistake by giving it primary placement for the
> full amount would result in an inequity not countenanced by Virginia law.

*Id.* at *5.

It is true that in many respects the position of Tysons is analogous to that of Mrs. Joynes.

Although Tysons, unlike Mrs. Joynes, never expressly subordinated its lien, it knew when it

acquired the Congressional Funding deed of trust that it was in a second-lien position, and there

is no evidence that it had any specific expectation that it would be promoted to a first position.

On the other hand, the Congressional Funding loan was not a long-term loan but had a maturity

of two years, and Tysons would reasonably have expected to be paid off when the property was

sold or refinanced.  Instead, its lien was simply overlooked at the time the American Brokers

Conduit and Secured Lending loans were made.  The American Brokers Conduit loan, as noted,

had a 30-year maturity.  BONY Mellon, as assignee of that loan, has already received far more

from the sales proceeds of the property than it paid for the note, while Tysons has received

nothing.  Of course, Tysons, like BONY Mellon, has an unsecured claim in the debtor's case for

any deficiency, but the reality is that unsecured claims in bankruptcy cases are frequently paid at

pennies on the dollar.  As in *Centreville Car Care*, BONY Mellon has a potential right of

recovery against the settlement agent, which Tysons does not.[6]  The present case, it is true,

differs from both *Centreville Car Care* and *Deutsche Bank* in that the proceeds from the

American Brokers Conduit loan did not go to the owner or to lien holders subordinate to Tysons

but only to First Savings as the holder of the existing first deed of trust.  And, unlike the situation

in *Centreville Car Care*, the creditor seeking subrogation and the creditor whose deed of trust

had been elevated in priority by the payoff of the prior deed of trust have claims against the same

borrower.  *Deutsche Bank*, however, teaches that the "legal separation" between liability on the

loans and ownership of the property that existed in *Centreville Car Care* is not the only

circumstance that will defeat equitable subrogation.

But the most significant difference between this case and *Joynes* is that BONY Mellon

did not make the loan that paid off First Savings.  It acquired the note, not only at a very

substantial discount, but also after the priority of its security had been challenged in this court.

---

[6]  BONY Mellon has filed a complaint against Signature Title in state court, but no action
has been taken pending the resolution of this litigation.  There may also be a right of recovery
against applicable policies of title insurance.  The opinion in *Centreville Car Care* states that the
chancellor had received, but had expressly declined to consider, evidence of title insurance
policies insuring the buyers and their lender.  *Centreville*, 263 Va. at 346 n.2, 559 S.E.2d at 873
n.2.  The opinion nevertheless treats potential recovery under applicable title insurance policies
as a factor weighing against equitable subrogation.  *Id.* at 348, 559 S.E.2d at 874 (stating that
"subrogation would inure to the benefit of the negligent title examiner *and the party that insured
the title*[.]") (emphasis added).  In the present litigation, no evidence has been presented as to the
existence of title insurance, and the court declines to speculate.  The court simply notes that title
insurance coverage, if it exists, would further strengthen the case for denying equitable
subrogation.

Since equitable subrogation exists to protect justifiable expectations, the question squarely arises whether it has any applicability when the party seeking to invoke it either knew or had the ready means of knowing that it was buying a problematical asset.  Here BONY Mellon acquired its interest in the American Brokers Conduit note not as a holder in due course but only after the priority of the deed of trust had been squarely challenged in litigation.  Although the transfer of a negotiable instrument carries with it the legal rights of the transferor—including the right to enforce it according to its terms—it does not necessarily substitute the transferee to the equitable position of the transferor.  Put another way, while equity will intervene to protect an innocent party against loss when that can be done without prejudice to an equally innocent party, here BONY Mellon is seeking not to be protected against a loss but instead to garner a profit.  Under the circumstances, the court can only conclude that the equities simply do not favor subrogating BONY Mellon to the position of First Savings.  For that reason, BONY Mellon's motion for summary judgment will be denied and Tysons's cross-motion for summary judgment on Counts I and II of the complaint will be granted determining that the Tysons deed of trust has priority.  Because the ruling on Counts I and II of the complaint fully resolves the priority issue, the court need not reach Counts I and III of Tysons's counter-claim.

A separate order will be entered consistent with this opinion.


Date: _____          _____

                                       Stephen S. Mitchell
Alexandria, Virginia                   United States Bankruptcy Judge

Copies to:

David H. Cox, Esquire
Jackson & Campbell, P.C.
1120 20th Street, N.W., South Tower
Washington, DC 20036-3437
Counsel for the plaintiff

Jennifer Larkin Kneeland, Esquire
Linowes & Blocher LLP
7200 Wisconsin Ave., Suite 800
Bethesda, MD 20814
Counsel for defendants Tysons Financial, LLC
and Steven A. Michael, PLLC, Trustee